IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 8, 2017 Session

## BLOUNT COUNTY BOARD OF EDUCATION ET AL. v. CITY OF MARYVILLE, TENNESSEE ET AL.

Appeal from the Chancery Court for Blount County
No. 2014-053    Telford E. Forgety, Jr., Chancellor

No. E2017-00047-COA-R3-CV

This is one of four separate actions currently before this Court with the common issue of whether the version of Tennessee Code Annotated § 57-4-306(a)(2)(A) in effect prior to the July 2014 amendment of that statute required a municipality governed by its own liquor-by-the-drink referendum and operating its own school system to share one-half of its liquor-by-the-drink tax revenue with the county in which the municipality was located when the county had not enacted a liquor-by-the-drink referendum. The county commenced the instant action by filing a complaint requesting declaratory judgment of its asserted right to a portion of liquor-by-the-drink tax revenue collected within the two municipalities involved in this appeal. Following the trial court's denial of a motion to dismiss filed by the municipalities, the municipalities filed a motion for summary judgment. The county subsequently amended its complaint to, in the alternative, request reimbursement of the portion of liquor-by-the-drink tax revenue it had previously distributed to the municipalities' respective school systems from liquor-by-the-drink gross receipts collected at private clubs located within the county but outside the incorporated limits of the municipalities. The county then filed a motion for partial summary judgment on the original issue of the cities' purported liability to share a portion of their liquor-by-the-drink tax revenue with the county. Following a hearing, the trial court granted summary judgment in favor of the municipalities, finding that the municipalities were entitled, respectively, to keep all liquor-by-the-drink tax monies distributed to them by the Tennessee Commissioner of Revenue ("the Commissioner"). The county filed a motion to alter or amend, which the trial court granted insofar as it found that the county's claims for alternative relief had not been properly before the court when the judgment was entered. Upon subsequent competing motions for summary judgment, the trial court granted summary judgment in favor of the municipalities on the alternative claims as well. The county has appealed. Determining that the municipalities were not required under the applicable version of the statute to share their liquor-by-the-drink tax revenues with the county but that the county was required to share tax revenue

from liquor-by-the-drink sales within unincorporated areas of the county with all school systems in the county, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and RICHARD H. DINKINS, J., joined.

Robert N. Goddard, Maryville, Tennessee, for the appellant, Blount County Board of Education.

Craig L. Garrett, Maryville, Tennessee, for the appellant, Blount County, Tennessee.

Stephanie D. Coleman, Richard A. McCall, and Shelly L. Wilson, Knoxville, Tennessee, for the appellees, City of Maryville, Tennessee, and City of Alcoa, Tennessee.[1]

Melanie E. Davis, Maryville, Tennessee, for the appellee, City of Maryville, Tennessee.

**OPINION**

I. Factual and Procedural Background

The facts underlying this action are essentially undisputed. Tennessee Code Annotated § 57-4-301(c) (2013 & Supp. 2017) provides for a tax "to include each and every retail" of an alcoholic beverage sold for consumption on the premises by various establishments delineated in section -301, such as restaurants, hotels, sports facilities, and private clubs. This tax is commonly referred to as a "liquor-by-the-drink tax." *See* Tenn. Code Ann. § 57-4-306 (2013 & Supp. 2017); *Copper Cellar Corp. v. Jackson*, 762 S.W.2d 560, 562 (Tenn. 1988). Tennessee Code Annotated § 57-4-306, originally enacted in 1967, prescribes the manner in which proceeds from the liquor-by-the-drink tax are to be distributed, primarily in support of public education. At issue in this action is the version of section -306 in effect prior to the Tennessee General Assembly's 2014 amendment of that statutory section ("2014 Amendment"). *See* 2014 Tenn. Pub. Acts, Ch. 901 § 1 (H.B. 1403). Particularly at issue is statutory language added to subsection -306(a)(2)(A) through an amendment made by the General Assembly in 1982 ("1982 Amendment"). *See* 1982 Tenn. Pub. Acts, Ch. 942, §§ 1-2 (S.B. 1817).

_____

[1] On December 1, 2017, the appellees filed a notice of substitution, giving notice that Shelly L. Wilson would be substituted as co-counsel in place of J. Douglas Overbey, who had served as co-counsel on appeal up to that point.

The City of Maryville ("Maryville") passed a referendum authorizing liquor-by-the-drink sales in 1996, and the City of Alcoa ("Alcoa") passed such a referendum in 2004. The citizens of Blount County ("the County") had not approved a liquor-by-the-drink referendum at the time this action was commenced. Prior to Maryville's and Alcoa's (collectively, "the Cities'") respective approval of liquor-by-the-drink sales, private clubs located within each city's boundaries legally sold alcohol for consumption on the premises, and the Commissioner distributed one-half of those revenues to each municipality pursuant to Tennessee Code Annotated § 57-4-306(a). Each of the Cities had continually operated its own separate school system since before the 1967 enactment of the liquor-by-the-drink statutory scheme by the General Assembly, Maryville since 1913 and Alcoa since 1919.

Since passage of their respective referendums, the Cities had continued to receive fifty percent of gross receipt taxes arising from sales of liquor by the drink. The Cities had not distributed any of their liquor-by-the-drink revenue to the Blount County Schools or to Blount County generally. Simultaneously, within the unincorporated areas of the County, private clubs had legally sold alcohol for consumption on the premises through the time this action was commenced. The Commissioner had distributed one-half of those funds to the County, which in turn distributed one-quarter (or one-half of the half it had received) among the school systems in the County, including those managed by the Cities.

On May 23, 2014, the Blount County Board of Education ("the County Board") filed a complaint against the Cities in the Blount County Chancery Court ("trial court"), seeking declaratory judgment regarding the rights and responsibilities of the parties concerning the liquor-by-the-drink tax. The County Board requested, *inter alia*, an order directing the Cities to remit to the County "the amount of the Liquor Tax not distributed by [the Cities] to [the County Board] in the same manner as county property tax for schools is expended and distributed," plus prejudgment interest. The County estimated the amount of back liquor-by-the-drink tax revenue it was purportedly owed to be approximately $503,212.00 from Maryville and approximately $284,601.00 from Alcoa.

Maryville and Alcoa each filed a separate answer to the complaint on August 29, 2014, asserting, as pertinent to this appeal, that (1) Title 57, Chapter 4 of the Tennessee Code was not applicable to the County because the County had not authorized liquor-by-the-drink sales, (2) the County's complaint failed to state a claim upon which relief could be granted pursuant to Tennessee Rule of Civil Procedure 12.02(6), and (3) Tennessee Code Annotated § 57-4-306(a) (2013) did not operate to require the Cities to remit any part of their respective portions of liquor-by-the-drink tax proceeds received from the Commissioner to the County's school system. The Cities further argued, *inter alia*, that

3

the Blount County Board of Education was not a proper party to initiate and maintain an action against the Cities.

On November 4, 2014, the County Board filed a motion to amend the complaint in order to add the County as a plaintiff. The Cities, acting together, filed a response objecting to the motion to amend on November 18, 2014. The Cities concomitantly filed a motion to dismiss the original complaint, and the County Board filed a response. On December 29, 2014, the County Board filed a motion for judgment on the pleadings pursuant to Tennessee Rule of Civil Procedure 12.03, and, in conjunction with Blount County, an amended motion to amend the complaint in order to add Blount County as a plaintiff. The Cities subsequently filed a reply, *inter alia*, again objecting to the County Board's motion to amend the complaint. Following a hearing conducted on June 2, 2015, the trial court entered an order on June 25, 2015, denying the Cities' motion to dismiss and granting the County Board's motion to amend the complaint. We will hereinafter refer to the plaintiffs collectively as "the County."

In its June 2015 order, the trial court set the County's motion for judgment on the pleadings for subsequent hearing. The Cities then filed a motion for summary judgment on June 26, 2015, and the County filed its amended complaint on June 30, 2015, with the Cities subsequently filing an answer. On August 26, 2015, the County filed another motion to amend its complaint, adding, as pertinent to this appeal, alternative claims requesting reimbursement of the portion of liquor-by-the-drink tax revenue it had previously distributed to the Cities' respective school systems from liquor-by-the-drink gross receipts collected at private clubs located within the County but outside the incorporated limits of the Cities from November 1992 through the commencement of this action in August 2014. The County requested an alternative judgment against Maryville in the amount of $270,572.75 and against Alcoa in the amount of $90,602.12. The County then filed a motion for partial summary judgment on its original claims on October 1, 2015. Upon the August 2015 motion to amend and the Cities' supplemental response, the trial court conducted a hearing on October 20, 2015, and entered an order on November 9, 2015, granting the County's motion to amend the complaint to add the alternative claims.

In the meantime, the General Assembly amended Tennessee Code Annotated § 57-4-306(a)(2), effective July 1, 2014, setting forth, *inter alia*, a detailed process by which counties that were owed funds by municipalities under Tennessee Code Annotated § 57-4-306 could seek those funds and negotiate settlements as applicable. *See* 2014 Tenn. Pub. Acts, Ch. 901 § 1 (H.B. 1403). The 2014 Amendment included a distinction between the liquor-by-the-drink tax proceeds received by a local political subdivision in the time period spanning July 1, 2014, until June 30, 2015, and those proceeds received after July 1, 2015, when, according to the 2014 Amendment, the statute would revert

4

back to its pre-amendment language. *See* Tenn. Code Ann. § 57-4-306(b)-(c) (Supp. 2014); 2014 Tenn. Pub. Acts, Ch. 901 § 1 (H.B. 1403). However, the General Assembly has also amended Tennessee Code Annotated § 57-4-306 each year since the 2014 Amendment, extending the amended language in subsequent years, one year at a time. *See* 2015 Tenn. Pub. Acts, Ch. 220 §§ 1, 2 (S.B. 990); 2016 Tenn. Pub. Acts, Ch. 885 §§ 1, 2 (H.B. 1691); 2017 Tenn. Pub. Acts, Ch. 346 §§ 1, 2 (S.B. 1262).

Upon the Cities' motion for summary judgment filed in June 2015 and the County's motion for partial summary judgment filed in October 2015, the trial court entered an order on December 22, 2015, granting summary judgment in favor of the Cities and dismissing the County's amended complaint. In response to the Cities' argument that Title 57, Chapter 4 was inapplicable to the County, the court found that because the Commissioner had distributed to the County a portion of liquor-by-the-drink tax revenue collected from private clubs located within unincorporated areas of the County, "there has been a long-standing practical construction" that Tennessee Code Annotated § 57-4-306 applied to the County. The court also concluded that the language of Tennessee Code Annotated § 57-4-306(a) (2013) was ambiguous as to whether a municipality that operated its own school system and had passed a liquor-by-the-drink referendum was required to share the local political subdivision's portion of liquor-by-the-drink tax receipts with the County. However, upon analysis of the legislative history surrounding the 1982 Amendment and contemporaneous attorney general's opinions, the court determined that because the Cities operated their own school systems, they were not required to share their liquor-by-the-drink tax revenue with the County.

In also dismissing the County's alternative claims, the trial court found that under Tennessee Code Annotated § 57-4-306 (2013), "it [was] not inappropriate that the County divided the [liquor-by-the-drink] funds it received (from private clubs, etc., located outside the Cities) pro-rata with the Cities." Upon the County's subsequent motion to alter or amend the December 2015 judgment, the court entered an order on June 21, 2016, finding that the alternative claims had not been properly before the court and amending the December 2015 order to dismiss solely the County's original claims.

On June 29, 2016, the Cities filed a motion for summary judgment on the County's alternative claims regarding those liquor-by-the-drink tax monies that the County had previously shared with the Cities' school systems. The County responded by filing its own motion for summary judgment on its alternative claims on August 5, 2016. Following a hearing conducted on December 7, 2016, the trial court again granted summary judgment in favor of the Cities, dismissing the County's alternative claims. The court found that, pursuant to Tennessee Code Annotated § 57-4-306(a) (2013), the County was required to share the liquor-by-the-drink tax revenue it received from private club sales collected in unincorporated areas of the County with the Cities' school systems

in the same manner as the county property tax was expended and distributed, by average daily attendance in each school system located within the County. The court entered an order to this effect, incorporating its memorandum opinion, on December 22, 2016.

The County timely appealed. Upon a motion to consolidate filed by the appellants in a separate action sharing the same overarching question of statutory interpretation, this Court entered an order on May 26, 2017, granting the motion "only to the extent that these cases shall be set for oral argument on the same docket and on the same day."[2]

## II. Issues Presented

Blount County presents the following issues on appeal, which we have restated as follows:

1. Whether the trial court erred by declining to find that the version of Tennessee Code Annotated § 57-4-306(a)(2)(A) in effect prior to the 2014 Amendment required the Cities, as municipalities governed by their own liquor-by-the-drink referendums and operating their own school systems, to share one-half of their liquor-by-the-drink tax revenue with the County when the County had not enacted a liquor-by-the-drink referendum.

2. Whether the trial court erred by declining to find that the pre-2014 version of Tennessee Code Annotated § 57-4-306(a)(2) required that one-half of all liquor-by-the-drink sales tax revenue received by the Cities must be distributed in support of education in the same manner as the County property tax is distributed.

3. Whether the trial court erred by finding that the County was required to share with the Cities the liquor-by-the-drink sales tax revenue received from the Commissioner, for receipts collected in unincorporated areas of the County, in the same manner as the county property tax for schools is distributed.

---

[2] The other three cases currently before this Court on the same overarching issue are *Bradley Cty. Sch. Sys. by and through the Bradley Cty. Bd. of Educ. v. City of Cleveland*, No. E2016-01030-COA-R3-CV; *Sullivan Cty. v. City of Bristol*, No. E2016-02109-COA-R3-CV; and *Washington Cty. Sch. Sys. v. City of Johnson City*, No. E2016-02583-COA-R9-CV.

## III. Standard of Review

The grant or denial of a motion for summary judgment is a matter of law; therefore, our standard of review is *de novo* with no presumption of correctness. *See Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015); *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 671 (Tenn. 2013) (citing *Kinsler v. Berkline, LLC*, 320 S.W.3d 796, 799 (Tenn. 2010)). As such, this Court must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Rye*, 477 S.W.3d at 250. "Statutory construction is a question of law that is reviewable on a de novo basis without any presumption of correctness." *In re Estate of Tanner*, 295 S.W.3d 610, 613 (Tenn. 2009).

As our Supreme Court has explained concerning the requirements for a movant to prevail on a motion for summary judgment pursuant to Tennessee Rule of Civil Procedure 56:

> We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id.* When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. [574,] 586, 106 S.Ct. 1348 [(1986)]. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after

7

adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

*Rye*, 477 S.W.3d at 264-65 (emphasis in original). Pursuant to Tennessee Rule of Civil Procedure 56.04, the trial court must "state the legal grounds upon which the court denies or grants the motion" for summary judgment, and our Supreme Court has instructed that the trial court must state these grounds "before it invites or requests the prevailing party to draft a proposed order." *See Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 316 (Tenn. 2014).

## IV. Distribution of Liquor-by-the-Drink Tax Revenue

The County contends that the trial court erred by finding that the version of Tennessee Code Annotated § 57-4-306(a)(2)(A) (2013) in effect prior to the 2014 Amendment did not require the Cities to share one-half of their liquor-by-the-drink tax revenue with the County's school system. The Cities assert that the trial court properly interpreted the governing statute as directing that because the Cities each operated their own school systems, the portion of their liquor-by-the-drink revenue not paid into the state's general education fund was to be split between each City's respective school system and the City itself. Upon careful review, we determine that the governing statute was ambiguous in that the distribution scheme for a city operating its own school system could be reasonably interpreted in more than one way. Having therefore analyzed the surrounding statutory scheme, the legislative history, and other applicable authorities, as well as the record in this action, we conclude that the trial court did not err in determining that the Cities were not required to share one-half of their liquor-by-the-drink tax revenue with the County's school system.

In conducting this analysis, we adhere to the following longstanding principles of statutory interpretation:

When dealing with statutory interpretation, well-defined precepts apply. Our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. *Houghton v. Aramark Educ. Res., Inc.,* 90 S.W.3d 676, 678 (Tenn. 2002). In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious

8

intention of the General Assembly is not violated by so doing. *In re C.K.G.,* 173 S.W.3d 714, 722 (Tenn. 2005). When a statute is clear, we apply the plain meaning without complicating the task. *Eastman Chem. Co. v. Johnson,* 151 S.W.3d 503, 507 (Tenn. 2004). Our obligation is simply to enforce the written language. *Abels ex rel. Hunt v. Genie Indus., Inc.,* 202 S.W.3d 99, 102 (Tenn. 2006). It is only when a statute is ambiguous that we may reference the broader statutory scheme, the history of the legislation, or other sources. *Parks v. Tenn. Mun. League Risk Mgmt. Pool,* 974 S.W.2d 677, 679 (Tenn. 1998). Further, the language of a statute cannot be considered in a vacuum, but "should be construed, if practicable, so that its component parts are consistent and reasonable." *Marsh v. Henderson,* 221 Tenn. 42, 424 S.W.2d 193, 196 (1968). Any interpretation of the statute that "would render one section of the act repugnant to another" should be avoided. *Tenn. Elec. Power Co. v. City of Chattanooga,* 172 Tenn. 505, 114 S.W.2d 441, 444 (1937). We also must presume that the General Assembly was aware of any prior enactments at the time the legislation passed. *Owens v. State,* 908 S.W.2d 923, 926 (Tenn. 1995).

*In re Estate of Tanner*, 295 S.W.3d at 613-14.

A. Ambiguity of Tennessee Code Annotated § 57-4-306(a)(2)(A) (2013)

The version of Tennessee Code Annotated § 57-4-306 in effect when this action was commenced provided in pertinent part:

(a)    All gross receipt taxes collected under § 57-4-301(c) shall be distributed by the commissioner as follows:

    (1)    Fifty percent (50%) to the general fund to be earmarked for education purposes; and

    (2)    Fifty percent (50%) to the local political subdivision as follows:

        (A)    One half (½) of the proceeds shall be expended and distributed in the same manner as the county property tax for schools is expended and distributed; provided, however, that except in counties having a population of not less than twenty-seven thousand nine hundred (27,900) nor more than twenty-seven thousand nine

9

hundred twenty (27,920), according to the 1980 federal census or any subsequent federal census, any proceeds expended and distributed to municipalities which do not operate their own school systems separate from the county are required to remit one half (½) of their proceeds of the gross receipts liquor-by-the-drink tax to the county school fund; and

(B)     The other one half (½) shall be distributed as follows:

(i)     Collections of gross receipts collected in unincorporated areas, to the county general fund; and

(ii)    Collections of gross receipts in incorporated cities and towns, to the city or town wherein such tax is collected.

(b)     Notwithstanding subdivision (a)(2), the fifty percent (50%) of the gross receipt taxes allocated to local political subdivisions by subdivision (a)(2) and collected in a municipality which is a premier tourist resort shall be distributed to and expended by such municipality for schools in such municipality.

Tenn. Code Ann. § 57-4-306 (2013).

The applicable version of Tennessee Code Annotated § 57-4-301(c) (2013), referenced in subsection -306(a), provided:

(c)     In addition to the privilege taxes levied in subdivision (b)(1), there is further levied a tax equal to the rate of fifteen percent (15%) of the sales price of all alcoholic beverages sold for consumption on the premises, the tax to be computed on the gross sales of alcoholic beverages for consumption on the premises for the purpose of remitting the tax due the state, and to include each and every retail thereof.[3]

---

[3] Effective May 9, 2017, the General Assembly amended Tennessee Code Annotated § 57-4-301(c) to designate the prior version of subsection -301(c) as -301(c)(1) and add a subsection -301(c)(2). *See* 2017 Tenn. Pub. Acts, Ch. 338 § 4 (S.B. 798).

Subsection -301(b)(1) (2013 & Supp. 2017) sets forth privilege taxes to be paid to the alcoholic beverage commission by "[e]ach applicant for an on-premises consumption license" during the application process and on an ongoing basis as the privilege is exercised, according to such criteria as the type of seller, seating capacity, and percentage of gross sales. Subsection -301(c), in both its prior and current versions, thus adds to the privilege taxes levied in -301(b)(1) the fifteen-percent, liquor-by-the-drink tax applied to alcoholic beverages consumed on the premises. Pursuant to subsection -306(a)(1), which remains unchanged since the version governing here, all of the gross receipt liquor-by-the-drink taxes are to be distributed by the Commissioner, with fifty percent allocated to the state's general fund, where they are earmarked for education purposes. Tenn. Code Ann. § 57-4-306(a)(1) (2013 & Supp. 2017). Up to this point, the clarity of section -306 is not in dispute.

At issue in this action is the second fifty percent of the gross receipt taxes, which, under the governing version of the statute, were to be distributed to the "local political subdivision." *See* Tenn. Code Ann. § 57-4-306(a)(2) (2013). Particularly at issue is the distribution of the twenty-five percent (half of the fifty percent returned to the local political subdivision by the Commissioner) as set forth in subsection -306(a)(2)(A). The phrase, "local political subdivision," is not expressly defined in Title 57, Chapter 4. In general, a "political subdivision" may be defined as "[a] division of a state that exists primarily to discharge some function of local government." BLACK'S LAW DICTIONARY 1197 (8th ed. 2004). For example, within Tennessee's Governmental Tort Liability Act, a "governmental entity" is defined in part as "any political subdivision of the state of Tennessee including, but not limited to, any municipality, metropolitan government, county, utility district, school district . . . ." Tenn. Code Ann. § 29-20-102(3)(A) (2012 & Supp. 2017) (emphasis added). Accordingly, the County and each of the Cities are local political subdivisions of the state. However, whether the applicable version of Title 57, Chapter 4 applied to a local political subdivision that had not authorized liquor-by-the-drink sales is a separate question, which we will address in a subsequent portion of this analysis.

We note that the plain language of Tennessee Code Annotated § 57-4-306(a)(2)(B) (2013), which disposed of the final twenty-five percent of liquor-by-the-drink gross receipt taxes, is not in dispute. This subsection provided that twenty-five percent of gross receipt taxes (or fifty percent of the revenue returned to the local political subdivision by the Commissioner) would be distributed to a county's general fund if the gross receipt taxes were collected in unincorporated areas of the county and to a city or town if the gross receipt taxes were collected in that city or town. Tenn. Code Ann. § 57-4-306(a)(2)(B) (2013). The applicable version of subsection -306(b), which provided for distribution of gross receipt taxes collected in a municipality that was a premier tourist resort, as that term was defined in Tennessee Code Annotated § 57-4-

102(26) (2013), is also not in dispute.  The question of statutory interpretation at issue is thus narrowed to the distribution scheme set forth for twenty-five percent of the gross receipt taxes from liquor-by-the-drink revenue in subsection -306(a)(2)(A) (2013).

In the applicable version, subsections -306(a)(2)(A) and -306(a)(2)(B) were joined by a semi-colon and the coordinating conjunction, "and."  Subsection -306(a)(2)(A), up to the conjunction joining it to -306(a)(2)(B), stated:

> One half (½) of the proceeds shall be expended and distributed in the same manner as the county property tax for schools is expended and distributed; provided, however, that except in counties having a population of not less than twenty-seven thousand nine hundred (27,900) nor more than twenty-seven thousand nine hundred twenty (27,920), according to the 1980 federal census or any subsequent federal census, any proceeds expended and distributed to municipalities which do not operate their own school systems separate from the county are required to remit one half (½) of their proceeds of the gross receipts liquor-by-the-drink tax to the county school fund; . . . .

The paragraph began with an independent clause, ending with the first semi-colon, which provided:  "One half (½) of the proceeds shall be expended and distributed in the same manner as the county property tax for schools is expended and distributed; . . . ."  This statement, which stood as its own sentence prior to the 1982 Amendment, was linked in the applicable version to an additional clause by the semi-colon, beginning with "provided, however that . . . ."

We note that when the 1982 Amendment was approved by the General Assembly, "provided" began a new sentence and that the punctuation was subsequently changed to a semi-colon, apparently during codification of the 1982 Amendment.  However, we find this distinction immaterial to analysis of the statute.  The meaning of "provided," as it was utilized here as a conjunction, is "[o]n the condition or understanding (that)."  *See* BLACK'S LAW DICTIONARY at 1261-62.  Combined with "however," "provided" functioned as a conjunctive adverbial phrase, with the standard function of "join[ing] two clauses and indicat[ing] the relationship between them."  *See generally* BRYAN A. GARNER, THE REDBOOK, A MANUAL ON LEGAL STYLE, 207 (3d ed. 2013).

A semi-colon, when utilized in its non-listing function, separates two independent but related clauses and "generally signals addition or contrast."  *See* CHERYL GLENN & LORETTA GRAY, HODGES' HARBRACE HANDBOOK 63 (16th ed. 2007).  Of course, a period also separates independent clauses, but one sentence does not follow another in a vacuum.  In this instance, the amended language began with the conjunctive adverbial

12

phrase, "provided, however," which through its meaning connected the proviso to the clause preceding it, whether that connection was signaled by a semi-colon, as in the printed version of the amended statute, or simply through the neighboring proximity of two sentences and context of those sentences, as in the version of the 1982 Amendment passed by the legislature. The phrase, "provided, however," was followed by the nominalizer, "that," signaling what was provided, which in this case was the entire clause up to the end of subsection -306(a)(2)(A). The use of "provided that" thus created a proviso, or "a provision that begins with the words *provided that* and supplies a condition, exception, or addition." *See* BLACK'S LAW DICTIONARY at 1262 (emphasis in original).

Immediately following "provided, however that . . ." the General Assembly included an exception, narrowly drawn as applying "in counties having a population of not less than twenty-seven thousand nine hundred (27,900) nor more than twenty-seven thousand nine hundred twenty (27,920)." Tenn. Code Ann. § 57-4-306(a)(2)(A) (2013). As the legislative history of the 1982 Amendment indicates, the General Assembly designed the exception to the proviso to apply solely to Bedford County. Given that the above population parameters do not apply to Blount County, we can, for the purpose of our analysis, omit the exception, yielding the following:

> One half (½) of the proceeds shall be expended and distributed in the same manner as the county property tax for schools is expended and distributed; provided, however, that . . . any proceeds expended and distributed to municipalities which do not operate their own school systems separate from the county are required to remit one half (½) of their proceeds of the gross receipts liquor-by-the-drink tax to the county school fund; . . . .

*See id.*

In other words, one-half of the proceeds were to be expended and distributed in the same manner as the county property tax for schools on the condition or understanding that "any proceeds expended and distributed to municipalities which [did] not operate their own school systems separate from the county [were] required to remit one half (½) of their proceeds of the gross receipts liquor-by-the-drink tax to the county school fund." *See id.* (emphasis added). The underlined clause functioned as a restrictive relative clause, restricting the "municipalities" to which this proviso applied to those that did not operate their own school systems.[4]

---

[4] Although the relative pronoun, "which," generally would be used to indicate a nonrestrictive relative clause while the relative pronoun, "that," would be used to indicate a restrictive clause, interpreting "which" as nonrestrictive in this instance would be nonsensical because it would mean that no municipalities operated their own school systems. We note also that this "which" clause is not marked by

13

The Cities rely in part on this proviso as excluding them from remitting any part of their liquor-by-the-drink proceeds to the County's school system, whether in the manner in which the county property tax for schools is distributed or into the County's school fund, because the Cities have each operated their own separate school systems since prior to the 1967 initial enactment of the liquor-by-the-drink tax. We agree that under the plain language of the applicable version of subsection -306(a)(2)(A), the Cities were excluded from the proviso of remitting one-half of their proceeds into the County's school fund because the Cities operated their own school systems. However, it is not clear from the structure and plain language of the first part of subsection -306(a)(2)(A) whether the Cities' operation of their own school systems excluded them from the general rule that "one-half of the proceeds [were to] be expended and distributed in the same manner as the county property tax for schools [was] expended and distributed[.]" *See id.*

The statute established this general rule and then set forth a condition or understanding that applied to municipalities not operating their own schools. This version of the statute did not clarify whether the opposite of the proviso was true, in other words, whether a municipality operating its own school system could disregard the general rule of distribution in the manner of county property tax and instead distribute one-half of its proceeds to its own school system. Although the placement of the conjunctive adverb, "however," following "provided" in subsection -306(a)(2)(A) would typically indicate that the proviso is in some manner antithetical to the general rule of distribution in the manner of county property tax, it is not clear from the plain language of subsection -306(a)(2)(A) how it would be so.

To summarize, it is possible to reasonably interpret the proviso as simply operating to ensure that a municipality without its own school system would remit one-half of its liquor-by-the-drink proceeds to the county within which it was located. It is also possible to reasonably interpret the proviso as operating to require solely those municipalities not operating their own school systems to remit proceeds to the counties in which they were located, effectively exempting those municipalities that operated their own school systems. The latter interpretation utilizes the longstanding maxim of statutory construction maintaining that "the expression of one thing implies the exclusion of all things not expressly mentioned." *See Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 84 (Tenn. 2001) (citing *City of Knoxville v. Brown*, 260 S.W.2d 264, 268 (Tenn. 1953)). We do not find this maxim dispositive in this instance, however, because the statute is ambiguous regarding whether the general rule of distribution in the manner of the property tax for schools would still apply to municipalities to which the proviso does not

paired commas as a nonrestrictive relative clause normally would be. The drafters appear simply to have made the very common grammatical error of using "which" rather than "that" as a restrictive relative pronoun. *See generally* GARNER, THE REDBOOK, A MANUAL ON LEGAL STYLE at 188-90.

apply. Because the requirement in Tennessee Code Annotated § 57-4-306(a)(2)(A) (2013) that municipalities without school systems must remit proceeds to counties can be reasonably interpreted in more than one way when municipalities that do operate their own school systems are at issue, we determine this requirement in the applicable version of the statute to be ambiguous. *See Bryant v. HCA Health Servs. of N. Tenn., Inc.*, 15 S.W.3d 804, 809 (Tenn. 2000) ("A statute is ambiguous if the statute is capable of conveying more than one meaning.").

B. Consideration of Statutory Framework, Legislative History, and Other Sources

Having determined that Tennessee Code Annotated § 57-4-306(a)(2)(A) (2013) was ambiguous with regard to whether municipalities with their own school systems were required to remit a portion of liquor-by-the-drink tax proceeds to the counties in which they were located, we now consider the statutory framework, legislative history, and other sources surrounding the version of the statute governing this action. *See Arden v. Kozawa*, 466 S.W.3d 758, 764 (Tenn. 2015) ("Where statutory language is ambiguous, we may decipher legislative intent in other ways, including consideration of the broader statutory scheme, legislative history, and other sources."). We begin with the Cities' assertion that Tennessee Code Annotated § 57-4-103(a)(1) (2013) operated to render subsection -306 inapplicable to a county, such as Blount County, that had not passed a liquor-by-the-drink referendum. Upon careful review, we conclude that because subsection -103(a)(1) set forth the effectiveness of the entire statutory chapter in which the applicable version of subsection -306(a) was located, subsection -103(a)(1) operated to classify a "local political subdivision" receiving liquor-by-the-drink taxes from the Commissioner as one that had passed a liquor-by-the-drink referendum. We further conclude, however, that this did not necessarily exempt the Cities from the general requirement of subsection -306(a)(2)(A) of distributing one-half of their respective liquor-by-the-drink revenue in the manner of county property tax distribution.

Title 57 of the Tennessee Code is entitled, "Intoxicating Liquors." Chapter 4 of Title 57 is entitled, "Consumption of Alcoholic Beverages on Premises," and it consists of three parts: Part 1 – "General Provisions,"; Part 2 – "Administration, Enforcement, Prohibited Acts"; and Part 3 – "Taxes and Fees." This overall structure has remained unchanged since the present action was commenced, as has the language of Tennessee Code Annotated § 57-4-103(a)(1), which provides within the general provisions of Title 57:

> This chapter shall be effective in any jurisdiction which authorizes the sale of alcoholic beverages for consumption on the premises in a referendum in the manner prescribed by § 57-3-106; provided, that, in addition to any other method authorized for holding an election pursuant to § 57-3-106, an

15

election may be held for such sales upon adoption of a resolution by a two-thirds ($^2/_3$) vote of the legislative body of a county or municipality.

We determine this language regarding the effectiveness of Chapter 4 to be clear and unambiguous. Because Part 3 is within Chapter 4, Part 3 is effective in any jurisdiction that has authorized liquor-by-the-drink sales by referendum. *See In re Estate of Tanner*, 295 S.W.3d at 614 ("Any interpretation of the statute that 'would render one section of the act repugnant to another' should be avoided.") (quoting *Tenn. Elec. Power Co. v. City of Chattanooga,* 114 S.W.2d 441, 444 (Tenn. 1937)). Although the statutory scheme regarding alcoholic beverages does not provide a definition of "jurisdiction" as it is used in subsection §-103(a)(1), we further determine that the generally accepted definition of jurisdiction as it applies to governmental authority is applicable within the context of a jurisdiction's authorization of alcoholic beverage sales. Black's Law Dictionary defines "jurisdiction" within this context of governmental authority as a "government's general power to exercise authority over all persons and things within its territory," "geographic area within which political . . . authority may be exercised," or "political . . . subdivision within such an area." BLACK'S LAW DICTIONARY at 867. Therefore, at the time this action was commenced, Part 3 of Chapter 4 was effective in the jurisdiction of each of the Cities, which had authorized liquor-by-the-drink sales, but was not effective in the jurisdiction of the County, which had not authorized such sales.

The Cities argue that the ineffectiveness of Tennessee Code Annotated § 57-4-306(a) (2013) in the jurisdiction of the County means that the Cities were not required to remit any portion of their liquor-by-the-drink proceeds distributed by the Commissioner to the County. However, we do not agree that this conclusion automatically follows from subsection -103(a)(1) because the Cities, as jurisdictions having authorized the sale of alcoholic beverages for consumption on the premises, *see* Tenn. Code Ann. § 57-4-103(a)(1), and thereby local political subdivisions receiving liquor-by-the-drink gross receipt taxes from the Commissioner, *see* Tenn. Code Ann. § 57-4-306(a)(2), were required to follow the requirements of Chapter 4. This analysis leads us back to the ambiguity previously identified in subsection -306(a)(2)(A) but does not clarify it. It is still possible to reasonably interpret the proviso of subsection -306(a)(2)(A) as either simply ensuring that a municipality without its own school system would remit one-half of its liquor-by-the-drink proceeds to the county within which it was located or as actually exempting municipalities with their own school systems, such as the Cities of Maryville and Alcoa, from the general requirement of distributing one-half of their liquor-by-the-drink revenue in the manner of county property tax distribution.

Inasmuch as Tennessee Code Annotated § 57-4-306(a)(2)(A) (2013) provided that "[o]ne half (½) of the proceeds shall be expended and distributed in the same manner as the county property tax for schools is expended and distributed," it is important to

16

consider the statutory scheme for expenditure and distribution of the county property tax for schools. Tennessee Code Annotated § 49-3-315(a) (2016) provides in pertinent part:

> For each LEA [local education agency] there shall be levied for current operation and maintenance not more than one (1) school tax for all grades included in the LEA. Each LEA shall place in one (1) separate school fund all school revenues for current school operation purposes received from the state, county and other political subdivisions, if any. . . . All school funds for current operation and maintenance purposes collected by any county . . . shall be apportioned by the county trustee among the LEAs in the county on the basis of the WFTEADA [weighted full-time equivalent average daily attendance] maintained by each, during the current school year. For the purposes of making the apportionment of local school funds as set forth in this subsection (a), and in defining the WFTEADA for the current school year, the county director of schools and the county trustee shall be guided by the following procedure: . . . .[5]

The above statute goes on to delineate the procedure by which the county director of schools shall certify to the county trustee the weighted full-time equivalent average daily attendance ("WFTEADA") during the preceding school year and, in progressive fashion, estimate "the WFTEADA in the schools of the LEAs in the county" for successive quarters of the current and upcoming years. *See* Tenn. Code Ann. § 49-3-315(a)(1)-(5). Although the statutory procedure for determining the WFTEADAs involves county officials, the Cities, as local political subdivisions receiving liquor-by-the-drink tax revenue, would be able to remit a portion of those gross receipt taxes received from the Commissioner to the County's school fund, which arguably could then be distributed by the County according to the procedure delineated in the above statute. *See* Tenn. Code Ann. § 49-3-315(a) ("Each LEA shall place in one (1) separate school fund all school revenues for current school operation purposes received from the state, county and <u>other political subdivisions</u> . . . .") (emphasis added).

The question arises as to whether, if the County were successful in the present action, funds remitted by the Cities to the County's school fund would in turn be partially apportioned to schools operated by the Cities as LEAs geographically existing within the County. This Court recently interpreted Tennessee Code Annotated § 49-3-315(a) in light of whether a county was required to apportion funds from its "educational capital projects fund" to the school boards of cities located within the county. *See City of Athens Bd. of Educ. v. McMinn Cty.*, 467 S.W.3d 458, 459-60 (Tenn. Ct. App. 2014), *perm. app. denied* (Tenn. May 14, 2015). This Court noted that, with one exception for

---

[5] The definitions in brackets are provided pursuant to Tennessee Code Annotated §§ 49-1-103(2) (2016) (LEA) and 49-3-302(18) (2016) (WFTEADA).

transportation levies not relevant here, "[a]ll school funds *for current operation and maintenance purposes* collected by any county . . . shall be apportioned by the county trustee among the LEAs," including those LEAs operated by the cities located in the county. *Id.* at 460 (quoting Tenn. Code Ann. § 49-3-315(a)) (emphasis in *City of Athens*). Because the funds at issue in *City of Athens* had been collected by the county through levying "a special tax designated for a capital projects fund," this Court held that the funds had not been collected "for current operation and maintenance purposes" and therefore did not fall under the purview of Tennessee Code Annotated § 49-3-315(a). *City of Athens*, 467 S.W.3d at 465-66 (affirming the trial court's grant of summary judgment in favor of the county).

In the current analysis, the County is requesting that this Court interpret the language of Tennessee Code Annotated § 57-4-306(a)(2)(A) (2013) to mean that twenty-five percent (half of the amount returned to the local political subdivision by the Commissioner) of the gross receipt liquor-by-the-drink taxes collected within the incorporated limits of the Cities would be paid in the manner of the county property tax to the county school fund for distribution to all of the LEAs in the County, including those located within each of the Cities. Because such a distribution within the County of funds obtained from a "local political subdivision" such as each of the Cities is possible, *see* Tenn. Code Ann. § 49-3-315(a), we do not find the statutory scheme for expenditure and distribution of the county property tax for schools to be dispositive of the ambiguity previously identified in Tennessee Code Annotated § 57-4-306(a)(2)(A) (2013).[6]

However, we do find the legislative history surrounding the 1982 Amendment, which added the ambiguous language at issue to Tennessee Code Annotated § 57-4-306(a), to be instructive of the General Assembly's intent. Prior to the 1982 Amendment, the subject statutory section, then codified at § 57-162, provided in full:

> **Distribution of collections.**—All gross receipt taxes collected under subdivision (b) of § 57-157 shall be distributed by the commissioner of revenue as follows:

---

[6] The County also requests that this Court compare the language of the statute at issue to that utilized by the General Assembly when enacting the local option sales tax in 1963. *See* Tenn. Code Ann. § 67-6-712(a) (2013); 1963 Tenn. Pub. Acts, Ch. 329 § 4. The County asserts that because the local sales tax statute demonstrated a disbursement method involving the county property tax for schools according to weighted average daily attendance of students, this Court should conclude that proceeds from the liquor-by-the-drink gross receipts were intended to be distributed solely as in the county property tax for schools. Finding such a foray to be far afield from the statute at issue, we decline the County's invitation to superimpose the local sales tax statutory scheme upon the proviso effected within the liquor-by-the-drink statutory scheme by the 1982 Amendment to Tennessee Code Annotated § 57-4-306(a)(2)(A).

(a)     Fifty percent (50%) to the general fund to be earmarked for education purposes; and

(b)     Fifty percent (50%) to the local political subdivision.

(1)     One half (½) of the proceeds shall be expended and distributed in the same manner as the county property tax for schools is expended and distributed.

(2)     The other one half (½) shall be distributed as follows:

(a)     Collections of gross receipts collected in unincorporated areas, to the county general fund; and

(b)     Collections of gross receipts in incorporated cities, towns, to the city or town wherein such tax is collected.

Tenn. Code Ann. § 57-162 (1968).

Regarding the original enactment of the statute, the County posits that because the statute was initially effective solely in "those counties with population in excess of 235,000," *see* Tenn. Code Ann. § 57-164 (1968) (emphasis added), the legislature could not have meant for municipalities to be considered local political subdivisions under the statute in that municipalities, initially those with a population of at least 110,000, were not added until a 1971 amendment, *see* 1971 Tenn. Pub. Acts, Ch. 59 § 1.  We note, however, that by the time of the 1982 Amendment's enactment, the General Assembly was well aware that municipalities had been statutorily authorized to adopt liquor-by-the-drink sales through referendum for several years. *See In re Estate of Tanner*, 295 S.W.3d at 614.  ("We also must presume that the General Assembly was aware of any prior enactments at the time the legislation passed.").  Moreover, having determined the relevant ambiguity to be contained in the proviso of the 1982 Amendment, we further determine the County's argument regarding the initial exclusion of municipalities in 1967 to be unavailing.

In introducing the applicable Senate bill to the Finance, Ways and Means Committee in March 1982, Senator Albright explained the bill's purpose as follows:

Right now, the law provides that one-half of one percent of the gross receipts by liquor by the drink tax goes to the, to, into the school system –

19

provide into the school system – goes to the city for the school systems. In many counties, the cities do not operate a school system. They have been turning this over to the county because the county provides that school system for the city. There has been some. There was a couple of 'em. I have a whole bunch of little cities around Chattanooga. There was a couple of them that did not want to return this money over. They simply asked for an Attorney General's ruling that the legislative intent was that that's where it would go in the school system. And they didn't have a school system, they shouldn't be getting the money. That's an Attorney General ruling. Our county simply said rather than have an Attorney General's ruling, which – cause they would like to put this in legislation. And this just provides, however, then if proceeds expanding or distribution to municipalities which do not operate their own school system separate from the county, are required to remit one-half of their proceedings from the gross receipts liquor by the drink tax to the county school fund. And that is where it is intended to go anyway.

As the sponsoring legislator, Senator Albright then engaged in the following exchange with a committee member, Senator Crouch:

| | |
|---|---|
| Senator Crouch: | In other words, if, uh, we [are] still operating a city school system it doesn't affect – |
| Senator Albright: | It doesn't affect you at all. It goes to the city – |
| Senator Crouch: | They're still getting their . . . percent? |
| Senator Albright: | See the legislation . . . says for the school fund. That's what the – |
| Senator Crouch: | Okay. |

Senator Albright thus assured Senator Crouch that if a municipality were operating its own school system, the provision added by the 1982 Amendment would not affect the municipality because the liquor-by-the-drink taxes returned by the commissioner would still go "to the city."

In introducing the bill to the committee, Senator Albright referenced a "ruling" of the attorney general. At this point in time, the attorney general had issued two opinions interpreting the distribution scheme set forth in Tennessee Code Annotated § 57-4-306, the first in September 1980 ("1980 AG Opinion"), *see* Tenn. Op. Atty. Gen. 80-457, 1980

WL 103875 (Sept. 19, 1980), and the second in April 1981 ("1981 AG Opinion"), *see* Tenn. Op. Atty. Gen. 81-270, 1981 WL 142843 (Apr. 27, 1981). We note that "although opinions of the Attorney General may be persuasive authority, they are not controlling." *Beacon4, LLC v. I & L Invs., LLC*, 514 S.W.3d 153, 173 (Tenn. Ct. App. 2016). However, we do afford such opinions "'considerable deference,'" particularly because "'government officials rely upon them for guidance.'" *See id.* (quoting *State v. Black,* 897 S.W.2d 680, 683 (Tenn. 1995)). As to the statutory section at issue in this action, a series of three attorney general's opinions, released from 1981 to 1983, are informative concerning the situation surrounding the 1982 Amendment. Moreover, insofar as legislators indicated while introducing and explaining the 1982 Amendment that they were responding to various municipalities' reliance on the attorney general's 1980 and 1981 opinions, those opinions are integral to the legislative history as well.

The question proffered in the 1980 AG Opinion focused on the situation presented when a municipality had passed a liquor-by-the drink referendum but the county in which the municipality was located had not. *See* Tenn. Op. Atty. Gen. 80-457, 1980 WL 103875, at *1. The attorney general opined:

> It is the opinion of this office that if a municipality but not the county has approved by referendum the sale of alcoholic beverages for consumption on the premises the fifty percent (50%) distribution, under T.C.A. § 57-4-306(2), of the gross receipts tax collected would go entirely to the local municipality.

*Id.* The attorney general further concluded:

> [I]f there has been no countywide election approving the sale of alcoholic beverages for consumption on the premises in accord with T.C.A. § 57-4-103, then the provisions of Chapter 4 dealing with both the imposition of the tax and the distribution of the tax would have no application to such county and it would not be entitled to a distribution of any amounts under T.C.A. § 57-4-306(2) which go to the local political subdivision. Such local political subdivision, i.e., the city or town, would then be required to expend one half of the amount received <u>in the same manner as the county property tax for schools would be expended within the city or town</u>.

*Id.* at *2 (emphasis added). Thus, according to the 1980 AG Opinion, a municipality acting as the local political subdivision receiving gross receipt liquor-by-the-drink taxes would be required to expend and distribute one-half of the monies returned by the Commissioner solely to the schools located within the municipality.

21

The 1980 AG Opinion did not address the distinction between a municipality that operated its own school system and one that utilized a county school system to educate its students. However, this question was the focus of the 1981 AG Opinion, with the attorney general opining: "[T]hose municipalities which do not operate their own school system separate from the county would be required to remit one-half of [their] proceeds of the gross receipts liquor-by-the-drink tax to the county school fund." Tenn. Op. Atty. Gen. No. 81-270, 1981 WL 142843, at *1. Building on the prior analysis of Tennessee Code Annotated § 57-4-306 in the 1980 AG Opinion, the attorney general reasoned as follows:

> If the local municipality does not operate a separate school system, the one-half of the proceeds expended and distributed in the same manner as the county property tax for schools as mandated by subparagraph (A) would naturally have to be remitted to the county school fund.
>
> It appears clear that the purpose of the statute is to earmark a certain percentage of the proceeds of such taxes for the purpose of local education. This objective could be accomplished by the remittance of such amount to the county school fund where the municipality itself does not operate its own school system.

Tenn. Op. Atty. Gen. No. 81-270, 1981 WL 142843, at *1.

In introducing to his committee the Senate bill that became the 1982 Amendment, Senator Albright expressed an intent to codify the attorney general's opinion, requiring municipalities not operating their own school systems "to remit one-half of their proceedings from the gross receipts liquor by the drink tax to the county school fund." In sponsoring the bill during a March 4, 1982 session of the entire Senate, Senator Albright stated in pertinent part:

> This bill . . . just puts into law what's been the practice. And it says that one-half of the proceeds of the gross receipt liquor by the drink to the county school system where the city does not provide one.

The following exchange occurred in response:

> Senator Darnell:    Senator Albright as I understand it this is to make sure that the funds actually go to, to the county for schools – is that the intent of the bill? Or is that just a peripheral sort of thing that's involved here?

Senator Albright:     This just makes sure – right some of, in my area in
                      Chattanooga – we've had a couple of them that had to
                      be told, you don't have your own school system – the
                      county permits this – the statute says – can I just read
                      one brief sentence –

Senator Darnell:      --they won't turn over the money to the county?

Senator Albright:     This would make it that they have to turn it over.

This exchange demonstrates that when he stated previously that a city would have to distribute gross receipt taxes to the county in which it was located "where the city does not provide one," Senator Albright meant a city that does not provide a school system. At the close of the March 4, 1982 session, the Senate approved the bill as sponsored by Senator Albright.

We determine that as presented to and adopted in the Senate, the legislative intent of the 1982 Amendment was to correct a situation in which some municipalities that did not operate their own school systems were failing to distribute the statutorily required portion of liquor-by-the-drink gross receipt taxes to the counties whose school systems they utilized. As explained by the Senate sponsor, the intent was not to require municipalities that operated their own school systems to distribute liquor-by-the-drink revenue to the corresponding counties.

Subsequently, Representative Davis introduced the companion bill to the House Calendar and Rules Committee on April 7, 1982, by stating in relevant part:

Mr. Chairman and Members of the Committee House Bill 2277 provides that if, provides that in the distribution of liquor, local liquor by the drink taxes that it will be distributed as it is now in the same fashion that local property taxes is distributed for education. In the event that the municipality affected operates a school system, right now the, the reason for division in the law originally was for this percentage of the money to go [to] education – fifty percent to the county, fifty percent to the municipality involved. There are municipalities such as the one involved in my county that are collecting this tax but that are, that are not operating school systems. This simply changes the law to provide that in the event the city does not operate a, a, the school system, that the money will go to the county.

23

In response to a committee member's question regarding under what circumstances the proviso added by the 1982 Amendment would be "activated," Representative Davis replied:

> If there's, if a municipality is operating its own system it'll continue to get its share of the liquor by the drink money. Uh, only if it's not operating a school system and thereby using the county school system uh, will the money that has been going to the municipality for education go instead to the county.

The House approved the bill, with an amendment added to exclude Bedford County, in a vote taken during a full session conducted on May 5, 1982.[7] In introducing the bill to the House as a whole during an April 8, 1982 session, Representative Davis presented it as a remedy to a situation in which "[a]t the present time, there is no provision . . . that those municipalities that do not operate school systems will permit the money – which is to go to education from the liquor by the drink tax – to go to the county." The Senate subsequently adopted the bill as amended by the House without further discussion.

Upon thorough review of the language of the statute in light of the statutory framework, legislative history, and attorney general's opinions referenced by the legislative history, we hold that the General Assembly's intent in enacting the 1982 Amendment to Tennessee Code Annotated § 57-4-306(a)(2)(A) was to require solely those municipalities that did not operate their own school systems to share liquor-by-the-drink tax proceeds with the counties in which they were located. This conclusion is also supported by an opinion issued by the attorney general in January 1983, six months following enactment of the 1982 Amendment ("1983 AG Opinion"). *See* Tenn. Op. Atty. Gen. No. 83-36, 1983 WL 166853 (Jan. 18, 1983). Concluding that "the 1982 amendment to the statute was merely a codification of our opinion dated April 27, 1981," the attorney general opined in pertinent part:

> It is the opinion of this office that the proper distribution of the liquor-by-the-drink gross receipt privilege taxes under T.C.A. § 57-4-306(2)(A) depends upon whether a municipality maintains a separate school system, when the municipality but not the county has approved by referendum the sale of alcoholic beverages for consumption on the premises.

> \* \* \*

---

[7] During the April 7, 1982 House Calendar and Rules Committee meeting, Representative Phillips from Bedford County explained that his county was requesting an exception because a municipality within the county owned and paid expenses on buildings operated by the county's school system.

> If the municipality does operate a separate school system, it would be entitled to the fifty percent of the liquor-by-the-drink gross receipts privilege tax collected under T.C.A. § 57-4-306(2)(A).

*Id.* at *1. Although opinions of the attorney general are but persuasive authority, *see Beacon4*, 514 S.W.3d at 173, we conclude that the 1983 AG Opinion merits considerable deference given its issuance contemporaneously with the General Assembly's enactment of the 1982 Amendment and its consistency with the 1980 and 1981 opinions referenced by legislators who sponsored the 1982 Amendment. *See id.*

### C. 2014 Amendment to Tennessee Code Annotated § 57-4-306

Having concluded that the General Assembly's intent in enacting the 1982 Amendment was to require solely those municipalities that did not operate their own school systems to share liquor-by-the-drink tax proceeds with the counties in which they were located, we further determine that nothing in the General Assembly's adoption of the 2014 Amendment contradicts this conclusion. It is undisputed that the 2014 Amendment was not adopted with retroactive application. When analyzing legislative intent, we may view a subsequent, non-retroactive amendment as "'declaratory of the original legislative intent.'" *See Sneed v. City of Red Bank*, 459 S.W.3d 17, 32 (Tenn. 2014) (quoting *Fretwell v. Chaffin*, 652 S.W.2d 755, 757 (Tenn. 1983)). However, being mindful of the thirty-two-year time span between the 1982 and 2014 Amendments, we determine that the best indicator of legislative intent in this instance is the legislative history surrounding the 1982 Amendment itself.

Moreover, although the 2014 Amendment provided for a process by which counties that were owed funds by municipalities under Tennessee Code Annotated § 57-4-306 could seek those funds and negotiate settlements as applicable, nothing in the amended statutory language provided that municipalities operating their own kindergarten through twelfth-grade school systems, separate from the counties in which the municipalities were located, owed such funds to the corresponding counties. *See* Tenn. Code Ann. § 57-4-306 (Supp. 2014); 2014 Tenn. Pub. Acts, Ch. 901 § 1 (H.B. 1403). As amended in 2014, Tennessee Code Annotated § 57-4-306(a) provided:

> (a)      All gross receipt taxes collected under § 57-4-301(c) shall be distributed by the commissioner of revenue as follows:
>
> > (1)      Fifty percent (50%) to the general fund to be earmarked for education purposes; and

(2) The other fifty percent (50%) to be distributed to local political subdivisions as follows:

   (A) Collections for privileges exercised in an incorporated municipality shall be distributed by the commissioner to the city recorder; and

   (B) Collections for privileges exercised in an unincorporated area of the county shall be distributed by the commissioner to the county trustee.

Subsection (a) was thus amended to expressly provide for more than one local political subdivision, with distribution of collections for privileges exercised to be sent to the city recorder for those collections originating from a municipality and to the county trustee for those collections originating from unincorporated areas of a county. *See* Tenn. Code Ann. § 57-4-306(a) (Supp. 2014). Subsections (b) through (h) then provided a distribution scheme for liquor-by-the-drink proceeds received from July 1, 2014, until June 30, 2015. *See id.* at -306(b)-(h).[8] Although we find a detailed analysis of this distribution scheme unwarranted in an analysis of the prior version of the statute, we have examined the distribution scheme of the 2014 Amendment and determined that it essentially follows the ongoing intent of the General Assembly to have a portion of the proceeds from the liquor-by-the-drink tax benefit children who attend school within the jurisdiction, incorporated municipality or unincorporated county, wherein the gross receipts originated. *See id.* Insofar as the County argues that the 2014 Amendment demonstrates a contrary legislative intent underlying the 1982 Amendment, the County's argument is unavailing.

Finally, the County posits that public policy regarding funding education equally for all students supports the conclusion that a municipality must share its liquor-by-the-drink tax revenue with the county in which it is located. We note, however, that Tennessee Code Annotated § 57-3-106(a) (2013 & Supp. 2017) provides for a local option election in any county wherein the voters may decide to either permit or forbid "the manufacture, receipt, sale, storage, transportation, distribution and possession of alcoholic beverages . . . ." Even in counties, such as the County in this action, that have not approved a liquor-by-the-drink referendum, students benefit from the distribution of fifty percent of liquor-by-the-drink gross receipt taxes to the state's general fund, earmarked for education. *See* Tenn. Code Ann. § 57-4-306(a)(1).

---

[8] As noted previously, the General Assembly has amended Tennessee Code Annotated § 57-4-306 each year since the 2014 Amendment, extending the amended language in subsequent years, one year at a time. *See* 2015 Tenn. Pub. Acts, Ch. 220 §§ 1, 2 (S.B. 990); 2016 Tenn. Pub. Acts, Ch. 885 §§ 1, 2 (H.B. 1691); 2017 Tenn. Pub. Acts, Ch. 346 §§ 1, 2 (S.B. 1262).

Moreover, such an argument concerning perceived fairness of the tax distribution scheme provided by the statute would properly be directed to the General Assembly rather than to this Court. *See, e.g., City of Athens Bd. of Educ.*, 467 S.W.3d at 466 ("However compelling this argument [regarding the city's receiving its "fair share" of property taxes designated for county capital improvements] may be, it is properly directed to others, e.g., the General Assembly, not to this Court."). Inasmuch as we must apply Tennessee Code Annotated § 57-4-306 as it was amended in 1982 and as the General Assembly intended the amendment, we hold that, as a matter of law, the applicable version of the statute did not require the Cities to share their liquor-by-the-drink proceeds with the County. The trial court did not err in granting summary judgment in favor of the Cities on this issue.

## V. The County's Alternative Claims

The County also contends that the trial court erred by granting summary judgment in favor of the Cities on the County's alternative claims regarding liquor-by-the-drink sales tax revenue that the County had received from the Commissioner for receipts collected in unincorporated areas of the County from November 1992 through August 2014. Although the County had not passed a referendum authorizing liquor-by-the-drink sales, such sales had taken place legally at private clubs within the County since at least 1992. Prior to the filing of this action, the Commissioner had distributed fifty percent of these gross receipt taxes to the County. In turn, the County, proceeding according to its interpretation of Tennessee Code Annotated § 57-4-306(a)(2) (2013), had expended and distributed twenty-five percent, or half of the gross receipt taxes it had received, in the same manner as the county property tax for schools was expended and distributed, including distribution of a portion to the school system managed by each of the Cities. *See* Tenn. Code Ann. § 49-3-315(a).

In its alternative claims for relief, the County requested that each of the Cities be required to reimburse the funds its respective school system had received as a result of liquor-by-the-drink sales in unincorporated areas of the County, respectively, $270,572.75 that had been distributed to Maryville and $90,602.12 that had been distributed to Alcoa. The Cities assert that the trial court properly found that under the applicable version of section -306, the statutory distribution of liquor-by-the-drink gross receipt taxes was different for counties than it was for municipalities and that the County was required to expend and distribute the revenue it received from the Commissioner as the county property tax for schools was expended and distributed. Upon careful review, we determine that the trial court did not err by granting summary judgment in favor of the Cities on this issue.

At the outset, we note that according to the plain language of Tennessee Code Annotated § 57-4-103(a)(1), a "local political subdivision," as that term was used in Tennessee Code Annotated § 57-4-306(a)(2) (2013), would not have included the County in this action because the County had not approved a referendum authorizing liquor-by-the-drink sales. However, in this situation in which legal liquor-by-the-drink sales had occurred for many years at private clubs within unincorporated areas of the County, the Commissioner appears to have relied on subsection -306(a) to expend and distribute gross receipt liquor-by-the-drink taxes to the originating location, in this case to the County. To this extent, we agree with the trial court that there had been a "long-standing practical construction," relied upon by the Commissioner and local officials, applying subsection -306(a) to the County for distribution of liquor-by-the-drink sales taxes collected from private clubs within unincorporated areas. *See generally Am. Civil Liberties Union of Tenn. v. Darnell*, 195 S.W.3d 612, 626 n.12 (Tenn. 2006) ("A '[c]onstruction of the constitution adopted by the legislative department and long accepted and acquiesced in by the people is entitled to great weight, and in the absence of some showing of palpable error, is to be accepted as a correct interpretation.'") (quoting *LaFever v. Ware,* 365 S.W.2d 44, 47 (1963)).

In determining that the County was required to expend and distribute the portion of the funds it received from the Commissioner in the manner by which the county property tax for schools was expended and distributed, the trial court in its Memorandum Opinion examined Tennessee Code Annotated § 57-4-306(a) and made the following specific findings in pertinent part:

> We look at T.C.A. § 57-4-306(a). All gross receipts taxes collected shall be distributed by the commissioner, that is, the State Commissioner of Revenue.
>
> It is telling the Commissioner of Revenue what he or she must do. Shall be distributed as follows.
>
> Number one, 50 percent goes to general fund. That's the state general fund. Commissioner of Revenue, one, sends 50 percent to the state general fund.
>
> Number two, 50 percent to the "local political subdivision."
>
> So the Commissioner of Revenue really has got only two things to do. So, 50 percent to go to the state general fund and 50 percent to a local political subdivision. Then the Commissioner of Revenue is done with it. He or she is done with it.

28

But that's not all the statute says. It goes on, (a)(2)(A). Under the Subdivision 2, it says 50 percent to the local political subdivision. That subdivision statute goes on. One-half (1/2) of the proceeds shall be expended and distributed in the same manner as the county property tax for schools is expended and distributed.

All right. Let's stop right there for a moment. . . . [H]ow are proceeds of the County property tax in Blount County expended and distributed? How are they expended and distributed in Blount County? They are expended and distributed on the basis of average daily attendance of the County School System, versus Alcoa School System, versus Maryville School System. That's how they are expended and distributed. So there's that.

The statute goes on – leaving out some of the interim language, but the statute goes on. It says, Any proceeds expended and distributed to municipalities.

And that tells me that the legislature clearly anticipated and knew that there would be funds distributed by the commissioner to the municipalities. Otherwise, there's no need for that language to be in [the] statute.

Any proceeds expended and distributed to municipalities which do not operate their own school system separate from the county are all required to remit one-half (1/2) of their proceeds of the gross receipts back to the county school fund.

* * *

[I]t's clear to me, that the legislature knew that there were going to be distributions both to counties and to cities.

Now, and the Court raised this in colloquy with counsel during the argument of the motion here. What would be . . . the proper distribution of liquor-by-the-drink funds in a situation – well let's say in Blount County – where Blount County had adopted liquor-by-the-drink, but Maryville and Alcoa had not?

Now, the actual situation that we have here is the reverse of that. But just for purposes of argument, for purposes of consideration to analogize, what would be the proper distribution of the funds in Blount County if Blount County had adopted liquor-by-the-drink, and Maryville and Alcoa had not?

All right. We know that the only funds – in that situation, the only funds that are generated are funds generated by sales in the county. We know that those funds are going to come to the county trustee. What then does the county trustee do with them?

And counsel for Blount County conceded, Okay, Judge, well, that's not the situation we have, by the way, here, so . . . your example doesn't really help us.

But I think it does, because it's clear to me in that scenario, the county trustee would be required to distribute the funds – to pro rate the funds between the County School System and the City School Systems, on the basis of the ADA, average daily attendance.

Okay. If that is the proper distribution in that scenario, how can it be different in this one? And I don't think it can. I don't think it can be.

Now, the County and the School Board have argued that, look, if you look at § 306, on the face of it, how can one conclude that it provides a different method for distribution of liquor-by-the-drink funds actually received by a city versus the county. The County argues that strenuously.

And again, I concur with the County, and for that matter, the Cities. The statute is not a model of clarity. It is not a model of clarity, and has not been for many years.

\* \* \*

I do not ignore the situation as you stand back and look at it broadly. How can this be fair, Judge, that the Cities get to keep all they collect and the County has got to share theirs? Well, again, within constitutional limits, the legislature doesn't necessarily have to be strictly fair. And they did what they did, and it is up to us to live within it.

30

We agree with the trial court on the issue of how the County was required to distribute its liquor-by-the-drink proceeds. Returning to our analysis of the plain language in Tennessee Code Annotated § 57-4-306(a)(2)(A) (2013), we again omit the exception that did not apply to Blount County to yield the following:

> One half (½) of the proceeds shall be expended and distributed in the same manner as the county property tax for schools is expended and distributed; provided, however, that . . . any proceeds expended and distributed to <u>municipalities</u> which do not operate their own school systems separate from the county are required to remit one half (½) of their proceeds of the gross receipts liquor-by-the-drink tax to the county school fund; . . . .

*See* Tenn. Code Ann. § 57-4-306(a)(2)(A) (2013) (emphasis added). We have previously determined the proviso contained in this subsection to be ambiguous insofar as it was not clear whether the general rule of distribution in the manner of the property tax for schools would apply to municipalities to which the proviso did not apply, in other words, those municipalities that operated their own schools. We thereby analyzed, *inter alia*, the legislative history surrounding the 1982 Amendment to hold that the General Assembly's intent was to add this proviso solely to affect those municipalities that did not operate their own school systems.

The important point concerning the issue before us now is that the proviso added by the 1982 Amendment unambiguously applied to "municipalities" and therefore did not apply to counties. *See Limbaugh*, 59 S.W.3d at 84 ("[T]he expression of one thing implies the exclusion of all things not expressly mentioned."). The statutory distribution required of counties was limited to the originally enacted sentence: "One half (1/2) of the proceeds shall be expended and distributed in the same manner as the county property tax for schools is expended and distributed[.]" *See* Tenn. Code Ann. § 57-4-306(a)(2)(A) (2013).

The County requests that we compare the liquor-by-the-drink tax distribution scheme to other statutory tax schemes benefitting education. We decline to do so because the plain language of Tennessee Code Annotated § 57-4-306(a)(2) (2013) regarding the distribution of liquor-by-the-drink tax funds returned by the Commissioner to a <u>county</u> was unambiguous. *See In re Estate of Tanner*, 295 S.W.3d at 614 ("When a statute is clear, we apply the plain meaning without complicating the task.). The County is not entitled to relief on this issue.

31

## VI. Conclusion

For the reasons stated above, we affirm the trial court's judgment.  This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.  The costs on appeal are assessed against the appellants, the Blount County Board of Education and Blount County, Tennessee.

_____
THOMAS R. FRIERSON, II,, JUDGE